# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>EDGAR ALBERT GUERRA-PALOMARES,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:17-cr-77<br><br>Judge Robert J. Shelby |

Defendant Edgar Albert Guerra-Palomares filed this motion to suppress narcotics found in his car during the course of a search following a traffic stop. He contends the search violated his Fourth Amendment rights. For the reasons below, the court agrees.

## BACKGROUND

On the morning of January 23, 2017, Guerra-Palomares was driving eastbound on I-80 in Summit County, Utah.[1] Utah Highway Patrol Trooper Jake Butcher was traveling the opposite direction when he saw Guerra-Palomares's car approaching and noticed it was missing a headlight.[2] Butcher made a U-turn and stopped Guerra-Palomares at 6:36 a.m.[3] Butcher approached the passenger side of the vehicle, and a female passenger rolled down the window.[4] Butcher noticed several things he later testified he believed suspicious, including the odor of air

---

[1] Dkt. 26 at 13. On June 20, 2017, the court held an evidentiary hearing at which Trooper Jake Butcher testified. The facts herein are taken from that hearing, and from a dash cam recording of the stop that was admitted into evidence at the hearing.

[2] *Id.*

[3] *Id.* at 47.

[4] *Id.* at 15.

freshener in the vehicle, numerous five hour energy bottles, and the fact that he directed questions to the male driver, Guerra-Palomares, but the female passenger responded.[5]

Butcher advised the occupants about the missing headlight and asked for license and registration.[6] Guerra-Palomares provided a Mexican consular ID (with a California address), proof of insurance, and a registration for the vehicle showing it was registered to him in Nebraska.[7] The passenger provided her Nebraska driver's license.[8]

At 6:38 a.m., Butcher returned to his patrol vehicle to write a warning citation for the headlight violation.[9] Seven minutes later, at 6:45 a.m., Butcher called in to dispatch to request a records check on both occupants.[10] He then returned to Guerra-Palomares's vehicle and asked the passenger if there was anything illegal inside, to which she responded no.[11] He informed the occupants he was planning to deploy his drug dog around the car and asked that they exit the vehicle while he did so.[12] Guerra-Palomares and his passenger left the car and stood nearby while Butcher attempted to deploy his dog.[13] The dog, however, was not "working satisfactorily," and after attempting to "reset" the dog several times, Butcher put the dog back in the patrol vehicle without receiving any positive indication of drugs or other contraband.[14]

---

[5] *Id.* at 15–16.
[6] *Id.* at 18.
[7] *Id.* at 18–20.
[8] *Id.* at 20.
[9] *Id.* at 24, 47.
[10] *Id.* at 25, 47–48.
[11] *Id.* at 26.
[12] *Id.*
[13] *Id.* at 28.
[14] *Id.* at 28–30.

By that time, at 6:53 a.m., the records check had not yet come back, and Butcher had not completed the citation, as he was waiting on the outstanding records check.[15] Butcher returned to Guerra-Palomares and his passenger, and again asked if there was anything illegal in the car, to which the passenger responded there was not.[16] He then asked if he could "search the vehicle to make sure," and "she stated sure."[17] Butcher asked the passenger to translate the search request to Guerra-Palomares in Spanish, which she did, and Guerra-Palomares looked at Butcher and said "oh, yeah" while nodding his head yes.[18] It was snowing at this point, and Butcher asked Guerra-Palomares and the passenger if they wanted to wait in Butcher's patrol vehicle, which they did.[19] Guerra-Palomares sat in the prisoner transport area, and the passenger sat in the front seat.[20] Butcher informed the passenger that he would "be searching the vehicle off of their consent" and that "if she needed anything from [him], if they had any problems or that she needed to get [his] attention for anything, to honk the horn on [the] patrol vehicle."[21] The passenger explained this to Guerra-Palomares and he indicated he understood.[22]

Butcher then began searching the vehicle. At 6:57 a.m., a dispatcher returned the records check.[23] At 7:16 a.m., after searching the vehicle for nearly twenty minutes, Butcher used a window wedge to pry open and look into the passenger side door panels of the vehicle, at which

---

[15] *Id.* at 31, 58.
[16] *Id.* at 31.
[17] *Id.*
[18] *Id.*
[19] *Id.* at 33.
[20] *Id.*
[21] *Id.* at 34.
[22] *Id.*
[23] *Id.* at 54.

3

point he saw what appeared to be several vacuum sealed plastic type packages.[24] He did the same on driver's side, and saw another sealed package.[25] He then removed the interior door panel, reached in, and determined the packages contained narcotics.[26]

Guerra-Palomares was subsequently charged with possession of methamphetamine and cocaine with intent to distribute. He now moves to suppress the methamphetamine and cocaine evidence.

## ANALYSIS

Guerra-Palomares raises several issues related to the stop, but the court focuses only on the validity of the search, as that issue is dispositive of the Motion. It is not disputed that Butcher conducted a "search" for Fourth Amendment purposes, nor is it disputed that he did so without a warrant. Thus, to be valid, the search must be justified by one of the exceptions to the Fourth Amendment's warrant requirement.[27]

The United States relies on the exception for consent. It contends that because both Guerra-Palomares and his passenger consented to search the vehicle, the search was lawful. Typically, determining whether a search was validly supported by consent requires an inquiry into the totality of the circumstances, but the Tenth Circuit has provided at least one bright-line rule: until an officer returns a defendant's documentation, the defendant cannot reasonably feel free to leave, so any consent given before that time is invalid.[28] In this case, Butcher took

---

[24] *Id.* at 35.

[25] *Id.*

[26] *Id.* at 36.

[27] *See United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994).

[28] *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1309 n.7 (10th Cir. 2006) ("During a routine traffic stop, an officer's retention of a defendant's documents is significant because it indicates that the defendant, as a general rule, did not reasonably feel free to terminate the encounter and, therefore, the government cannot rely on the defendant's consent to justify further detention, questioning, or a search.").

Guerra-Palomares's ID card, his registration, his insurance information, and his passenger's license back to his vehicle and began writing a citation at 6:38 a.m.[29] After deploying his dog, and while still waiting for the records check to return, Butcher asked for and received consent to search at 6:53 a.m.[30] At that point, the citation was not yet complete, as Butcher was still waiting for the records check, which did not come back until four minutes later, at 6:57 a.m.[31]

Thus, while it is not clear from the record when (if ever) Butcher returned Guerra-Palomares's and his passenger's documentation, it is clear that Butcher had neither received the records check nor completed the citation before obtaining consent to search. In other words, Guerra-Palomares and his passenger would not reasonably have felt free to leave at the time they consented. Indeed, Butcher testified they were not free to leave until "[a]fter the records check came back."[32] Because he obtained consent to search before that time, that consent was invalid, and "the government cannot rely on [it] to justify . . . a search."[33]

Nor do any other exceptions to the warrant requirement justify the search. Butcher never had probable cause to search the vehicle. He conceded as much, testifying that after running his dog around the car several times without an alert, and before asking for consent to search, he had "no probable cause to . . . search the vehicle" or to suspect "any criminal activity."[34] Neither party argues the search was supported by probable cause, and the court concludes it was not.

---

[29] Dkt. 26 at 21, 24, 47.

[30] *Id.* at 58.

[31] *Id.* at 54, 58.

[32] *Id.* at 59.

[33] *Guerrero-Espinoza*, 462 F.3d at 1309 n.7. Guerra-Palomares did not make this argument in his briefing or at oral argument, but the Tenth Circuit has cautioned that leaving the issue unaddressed would constitute clear error. *Id.* at 1308.

[34] Dkt. 26 at 57–58.

And while there is much discussion in the briefing concerning reasonable suspicion, reasonable suspicion—even assuming it existed—does not support prying open door panels in search of drugs. During a valid traffic stop, an officer may conduct a weapons search (also known as a vehicle frisk) of the passenger compartment if he has reasonable suspicion that an occupant "may be dangerous and may gain immediate control of weapons."[35] There is no indication in the record that Guerra-Palomares or his passenger were dangerous, nor were the spaces inside the door panels a part of the "passenger compartment," nor would any weapon hidden there have been immediately accessible. The search was not supported by reasonable suspicion.

The United States carries the burden of demonstrating that an exception to the warrant requirement justified its warrantless search of Guerra-Palomares's vehicle.[36] It has not met that burden. Guerra-Palomares's Motion to Suppress is GRANTED.[37] The methamphetamine and cocaine, along with any other evidenced seized during the search of Guerra-Palomares's vehicle, is excluded, and may not be used as direct evidence against Guerra-Palomares in his criminal prosecution.

**SO ORDERED** this 16th day of October, 2017.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[35] *United States v. Palmer*, 360 F.3d 1243, 1246 (10th Cir. 2004).

[36] *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993).

[37] Dkt. 16.